# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LINDA HOBBS, individually and as a
representative of the class,

       Plaintiff,

v.

GERBER PRODUCTS CO., a
corporation, d/b/a NESTLE
NUTRITION, NESTLE INFANT
NUTRITION, and NESTLE
NUTRITION NORTH AMERICA,

       Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 17 CV 3534

Judge John J. Tharp, Jr.

## MEMORANDUM OPINION AND ORDER

Gerber Products Company is a well-known manufacturer of baby foods. At issue in this case is Gerber's "Good Start Gentle" product ("GSG"), an infant formula made from partially hydrolyzed whey protein. Plaintiff Linda Hobbs claims that Gerber fraudulently marketed GSG by falsely representing that it would reduce the risk that infants would develop allergies to cow's milk and decrease incidences of the most common manifestation of such allergies, atopic dermatitis (eczema). Hobbs also claims that Gerber falsely implied that the Food and Drug Administration ("FDA") endorsed or certified Gerber's claims about GSG. Gerber challenges the sufficiency of Hobbs' pleading pursuant to Rules 12(b)(6) and 9(b), but the Court finds that the complaint adequately sets forth a claim premised on allegedly false and misleading statements by Gerber about the health benefits of GSG and therefore denies the motion to dismiss.

## BACKGROUND

Hobbs alleges that she routinely purchased GSG "beginning in 2012 until the early part of 2014." Compl. ¶ 75. During that period, Hobbs cared for three infants—two nephews and a niece—all of whom were born in 2012 and 2013. Hobbs says that she was exposed to Gerber's GSG

marketing materials over the same period. She purchased GSG, rather than other formulas, "based on Defendant's false and misleading claims" that GSG would reduce the risk of allergies and atopic dermatitis and that it was endorsed or certified by the FDA. *Id*. Hobbs bought GSG from retail stores in or near Champaign, Illinois, paying between $20 - $50 depending on the quantity purchased. She would not have purchased the product, or would not have paid the same price, had she known that Gerber's claims about GSG were false.

Although the complaint alleges others as well, Hobbs specifically claims that she saw three examples of fraudulent misrepresentations by Gerber as to GSG. The first (*see Figure 1*) is a



"tamper-evident seal" placed on the lid of a plastic container of GSG formula, which stated: "1ST & ONLY Routine Formula TO REDUCE RISK OF DEVELOPING ALLERGIES See Label Inside" and included a scan symbol. Compl. ¶ 76, Ex. B. Hobbs also alleges that she saw a television commercial

*Figure 1*

*Figure 2*

advertising GSG that included the statement: "But if you introduce formula, choose the Gerber Good Start Comfort Proteins Advantage. It's what makes Good Start formula easy to digest and may also provide protective benefits for your baby." Comp. ¶ 74, Ex. D (*Figure 2*); *see also* Gerber Good Gentle Formula with Comfort Proteins



Advantage Commercial, https://www. youtube.com/results?search_query= gerber+good+start+commercial (last viewed Aug. 4, 2018).

Hobbs also viewed the magazine advertisement shown in *Figure 3*, which states beneath the large-font banner text:

> If you have allergies in your family, breastfeeding your baby can help reduce their risk. And, if you decide to introduce formula, research shows the formula you first provide your baby may make a difference. In the case of Gerber® Good Start® Gentle Formula, it's the Comfort Proteins® Advantage that is easy to digest and may also deliver protective benefits. That's why Gerber® Good Start® Gentle Formula is nutrition inspired by breastmilk.

Compl. ¶ 74, Ex. E.

Central to Hobbs' claim and Gerber's motion is what the FDA authorized Gerber to say about GSG. Infant formula is a "food" within the meaning of the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA") and is subject to regulation by the FDA. In 2006, Gerber petitioned the FDA to approve a "qualified health claim" ("QHC") concerning GSG. Gerber's proposed QHC stated:



*Figure 3*

> Breastfeeding is the best way to nourish infants. For infants who are not exclusively breastfed, emerging clinical research in healthy infants with family history of allergy shows that feeding a 100% Whey-Protein Partially Hydrolyzed formula may reduce the risk of common food allergy symptoms, particularly allergic skin rash, when used instead of whole-protein cow's milk formula from the initiation of formula feeding.

Compl. ¶ 37. The FDA rejected Gerber's petition, concluding after "its review of the totality of publicly available scientific evidence . . . that there is no credible evidence for a relationship

between the consumption of 100 percent partially hydrolyzed whey protein in infant formula and a reduced risk of food allergy." *Id.* ¶ 39.

Three years later, in May 2009, Gerber again petitioned the FDA for approval of an QHC relating to GSG. This time, Gerber sought approval for the following claim:

> Breastfeeding is the best way to nourish infants. For infants who are not exclusively breastfed, emerging clinical research shows that, in healthy infants with family history of allergy, feeding a 100% Whey-Protein Partially Hydrolyzed infant formula instead of a formula containing intact cow's milk proteins may reduce the risk of developing the most common allergic disease of infancy—atopic dermatitis—throughout the 1st year of life and up to 3 years of age.

*Id.* ¶ 42. After two years of review and discussion with Gerber, the FDA concluded in May 2011 that "the current scientific evidence is appropriate for considering the exercise of enforcement discretion with respect to a qualified health claim concerning the relationship between 100% whey-protein partially hydrolyzed infant formula and a reduced risk of atopic dermatitis for a specific infant population who [sic] is fed such formula during a specific period of time." *See* "Whey-Protein Partially Hydrolyzed Infant Formula and Reduced Risk of Atopic Dermatitis" (May 24, 2011), ECF No. 19-2, Gerber Mem., Pirrara Dec., Ex. 1, at 2 ("FDA 2011 Letter"). But the FDA found that use of the term "emerging clinical research" was misleading based on the limited research (4 studies) that could be credited and that "the reduced risk of atopic dermatitis was observed only when infants consumed the 100 percent whey-protein partially hydrolyzed infant formula during the first 4 month of life," making information regarding the time period in which the formula was fed to infants necessary to make the statements accurate. Accordingly, the FDA approved several substantially modified versions of Gerber's proposed QHC:

> 1. ***Very little scientific evidence suggests*** that, for healthy infants who are not exclusively breastfed and who have a family history of allergy, feeding a 100% Whey-Protein Partially Hydrolyzed infant formula from birth up to 4 months of age instead of a formula containing intact cow's milk proteins may reduce the risk of developing atopic dermatitis throughout the 1st year of life and up to 3 years of age.

2. ***Little scientific evidence suggests*** that, for healthy infants who are not exclusively breastfed and who have a family history of allergy, feeding a 100% Whey-Protein Partially Hydrolyzed infant formula from birth up to 4 months of age instead of a formula containing intact cow's milk proteins may reduce the risk of developing atopic dermatitis throughout the 1st year of life.

3. For healthy infants who are not exclusively breastfed and who have a family history of allergy, feeding a 100% Whey-Protein Partially Hydrolyzed infant formula from birth up to 4 months of age instead of a formula containing intact cow's milk proteins may reduce the risk of developing atopic dermatitis throughout the 1st year of life and up to 3 years of age. FDA has concluded that ***the relationship between 100% Whey-Protein Partially Hydrolyzed infant formulas and the reduced risk of atopic dermatitis is uncertain, because there is very little scientific evidence for the relationship***.

4. For healthy infants who are not exclusively breastfed and who have a family history of allergy, feeding a 100% Whey-Protein Partially Hydrolyzed infant formula from birth up to 4 months of age instead of a formula containing intact cow's milk proteins may reduce the risk of developing atopic dermatitis throughout the 1st year of life. ***FDA has concluded that the relationship between 100% Whey-Protein Partially Hydrolyzed infant formulas and the reduced risk of atopic dermatitis is uncertain, because there is little scientific evidence for the relationship.***

*Id.* ¶ 45; FDA 2011 Letter (emphasis added).[1] The FDA's report concluded by noting that "FDA intends to consider exercising its enforcement discretion for the above qualified health claims when all the factors for enforcement discretion identified in this letter are met—in other words, when all of the information set forth in the FDA's approved statements was present.

The FDA subsequently issued a warning letter to Gerber on October 31, 2014 identifying numerous ways in which it deemed Gerber's GSG to be misbranded and to include misleading health claims that did not comply with the QHC's the FDA had approved in 2011 and which

---

[1] The FDA also required the use of additional language in conjunction with the use of any of the modified qualified health claims it approved, warning that "partially hydrolyzed formulas **should not be fed to infants who are allergic to milk or to infants with existing milk allergy symptoms**." FDA 2011 Letter, last page (emphasis in original).

restated claims about allergy reduction that the FDA had rejected in 2006.[2] Gerber responded to the warning letter, discontinued some of its GSG marketing (specifically, the "tamper-evident" sticker label described above), and the FDA closed the matter in July 2015.

Hobbs also alleges that "several compelling scientific studies have concluded that partially hydrolyzed whey formula does not lower the risk of developing allergies or allergic manifestations, including eczema, during infancy . . . when compared with conventional formula." *Id*. ¶ 49. She identifies only one such study, however, published in June 2011 by Adrian J. Lowe, Ph.D. ("Lowe study"), which concluded that "[t]here was no evidence that introducing [partially hydrolyzed whey formula] at the cessation of breast-feeding reduced the risk of allergic manifestations, including eczema . . . in [a] study of high-risk infants." *Id*. ¶ 50 and Ex. A.

Hobbs filed this putative class action in May 2017 after several other suits had been filed raising similar claims about Gerber's marketing materials for GSG. Her complaint presents three counts, or theories, of liability. In Count One, Hobbs asserts that Gerber's marketing of GSG violates the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"). She alleges breach of express warranty in Count Two, and in Count Three Hobbs asserts a common law fraudulent misrepresentation theory. Gerber moved to dismiss the complaint pursuant to Rule 12(b)(6) for failure to state a claim.

## DISCUSSION

Gerber's motion is based on Rule 12(b)(6). That rule authorizes dismissal of a complaint that fails to state a "claim." A "claim," for purposes of the rule, is a set of facts that gives rise to a

---

[2] Two days earlier, the Federal Trade Commission filed a lawsuit against Gerber, alleging that Gerber's claim that GSG reduces allergies was false or unsubstantiated and that Gerber had falsely represented that the FDA had approved Gerber's claims about the benefits of GSG. That suit remains pending. *See* 14 CV 6771 (D.N.J.).

grievance and an entitlement to a legal remedy. *See ACF 2006 Corp. v. Mark C. Ladendorf, Attorney at Law, P.C.*, 826 F.3d 976, 981 (7th Cir. 2016) ("Complaints plead claims, which is to say grievances"); *Liston v. King.com, Ltd.*, 254 F. Supp. 3d 989, 1002 (N.D. Ill. 2017); *Volling v. Antioch Rescue Squad*, 999 F. Supp. 2d 991, 996 (N.D. Ill. 2013). Gerber's motion proceeds as if the complaint here asserts three claims (as reflected in its three "counts"), but that is not so. Each of the "counts" in the complaint sets forth a theory as to why Gerber is liable to Hobbs, but each of those theories is premised on the same set of operative facts causing the same injury and would not entitle Hobbs to three different recoveries. Those theories, then, do not set forth separate "claims." "One set of facts producing one injury creates one claim for relief, no matter how many laws the deeds violate." *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 292 (7th Cir. 1992). Hobbs' complaint sets forth a single claim—namely, that Gerber's marketing materials defrauded her as to the health benefits of GSG and that she was economically injured as a result. She asserts three theories, or reasons, that she is entitled to damages from Gerber, but she was not required to do so; it is axiomatic that plaintiffs need not plead legal theories. *See Jajeh v. County of Cook*, 678 F.3d 560, 567 (7th Cir. 2012) (hostile work environment claim pleaded where complaint never used that term); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("[W]e have stated repeatedly (and frequently) that a complaint need not plead legal theories, which can be learned during discovery.").

The distinction between Hobbs' claim and her theories is not semantic; it bears directly on the Court's task in evaluating Gerber's motion to dismiss. Rule 12(b)(6) authorizes dismissal of a complaint for failure to state a claim; it does not speak of the dismissal of legal theories. A complaint may be dismissed pursuant to Rule 12(b)(6) only if the claim, or claims, it asserts give rise to no entitlement to relief under any legal theory. The upshot is that, for its motion to be

granted, Gerber must prevail on its argument as to each of the theories that Hobbs identifies in her complaint.[3] Failing that, the complaint "states a claim upon which relief can be granted" and the motion to dismiss the complaint must be denied. *See Richards v. Mitcheff*, 696 F.3d 635, 638 (7th Cir. 2012) (a claim survives if it is supported by at least one recognized legal theory). If one of Hobbs' theories suffices to support her claim, then, the question of whether her alternative theories are also viable will be irrelevant to the question of the survival of the complaint.[4]

Moving to the substance of the motion to dismiss, Gerber asserts that all three of Hobbs' "claims" (read, "counts") "hinge on the allegation that Gerber's advertising is false." Mem. at 2. It therefore mounts several challenges to the adequacy of Hobbs' pleading of falsity (along with other sundry challenges to Hobbs' three causes of action). None of these challenges warrants the dismissal of Hobbs' complaint. Claims of fraud are, of course, subject to the pleading standard set

---

[3] The same would be true as to any theories that Hobbs identified in her response to the motion even if they were not "expressly identified in the complaint." *Liston*, 254 F. Supp. 3d at 1002; *see Bartholet v. Reishauser A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 2012). Hobbs, however, does not argue theories that support her claim other than those identified in the complaint.

[4] That is not to say that the viability of other theories is irrelevant beyond the pleading stage; ultimately, the plaintiff must identify and rely on specific legal theories, the sufficiency of which is tested on summary judgment and/or at trial. The viability of a particular theory may also affect the scope of discovery. But although there may be good reasons for assessing the viability of alternative legal theories at an early stage in the proceedings, and courts (including this one) routinely invoke Rule 12(b)(6) to do so, it is not altogether clear (at least to this Court) that Rule 12(b)(6) provides a basis for "dismissing" a legal theory (as opposed to a claim). *See BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) (a "motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims"); *Zidek v. Analgesic Healthcare, Inc.*, No. 13 C 7742, 2014 WL 2566527, at *2 (N.D. Ill. June 6, 2014) (Leinenweber, J.) ("if the Court were to grant partial relief on this Motion, it would not be 'dismissing claims' but rather limiting the legal theories available to Plaintiffs to prove their entitlement to damages for these acts. The federal rules allow for dismissal for 'failure to state a claim' but do not provide a basis for striking individual legal theories.").

forth in Rule 9(b), which requires that in alleging fraud, "a party must state with particularity the circumstances constituting the fraud." This standard "ordinarily requires describing the who, what, when, where, and how of the fraud," *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016), but the Seventh Circuit has "warned that courts and litigants often erroneously take an overly rigid view of the formulation." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014). "[T]he precise level of particularity required under Rule 9(b) depends upon the facts of the case." *Presser*, 836 F.3d at 776. At bottom, to satisfy the Rule 9(b) particularity standard, "[i]t is enough to show, in detail, the nature of the charge, so that vague and unsubstantiated accusations of fraud do not lead to costly discovery and public obloquy." *U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854–55 (7th Cir. 2009). Hobbs' complaint satisfies this standard.

## I.     ICFA

"The intent of the Illinois Consumer Fraud and Deceptive Business Practices Act is "to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Camasta,* 761 F.3d at 739. To state a claim under the ICFA, a plaintiff must show: (1) a deceptive or unfair act or promise by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) that the unfair or deceptive practice occurred during a course of conduct involving trade or commerce. *Id.* And when, as here, the plaintiff is a private party, an action brought under the ICFA requires the plaintiff to show he suffered "actual damage" as a result of the defendant's violation of the act. *Id.*; *see also* 815 ILCS 505/10a. Conceding only that its conduct involved trade or commerce, Gerber challenges the adequacy of Hobbs' complaint as to the other three elements of a cause of action under the ICFA.

## A. Adequacy of Allegations Regarding Reliance on Particular False Statements

Gerber first contends that Hobbs' complaint fails to identify with sufficient particularity any false advertising on which she relied. This contention can be dispatched easily. Hobbs' complaint alleges that during the period beginning in 2012 and continuing to early 2014, she was exposed to at least three of the specific advertisements identified in the complaint. The complaint describes the representations alleged to be false and misleading in those ads, each of which asserts in some fashion that GSG reduces the risk of developing allergies generally or provides unspecified "protective benefits."[5] These allegedly false and misleading claims are further alleged to have been represented on the specific marketing materials to which Hobbs claims she was "exposed"—namely, on a sticker placed on the packaging in which the Infant Formula was sold, in a television commercial which aired at some point after April 9, 2012, and in a print advertisement. Hobbs alleges that she purchased GSG in reliance on Gerber's false and misleading statements. *See, e.g., id.* ¶¶ 9, 74-75, 102, 117.

That's not good enough, Gerber says, because the complaint doesn't specifically allege "where and when" Hobbs saw the ads or that she saw them before she purchased Gerber products. That means, according to Gerber, that Hobbs does not adequately allege that she relied on the allegedly false and misleading marketing materials she describes in the complaint. Specifically, Gerber maintains that Hobbs has failed to allege explicitly that she saw any of the offending materials before purchasing GSG products.

---

[5] *See* Compl. Ex. B (emphasis in original): GSG is "the first and only routine formula TO REDUCE THE RISK OF DEVELOPING ALLERGIES"; Ex. D: "may provide protective benefits"; Ex. E: "may also deliver protective benefits."

Gerber's claim that it is "left to guess if, when, and how Plaintiff viewed these advertisements" simply ignores the obvious inferences to be drawn from Hobbs' allegations. Gerber's central argument, for example—that Hobbs does not adequately allege that she saw any of the marketing materials before buying GSG products—is patently untenable. The complaint alleges expressly that Hobbs purchased GSG products "based on" the claims set forth in the marketing materials she saw, a statement that plainly alleges that Hobbs made purchases **after** exposure to the allegedly fraudulent claims in the GSG marketing materials she specifically identifies. The complaint alleges that during the identified period, Hobbs "frequently" acted as caretaker for her infant nephews and niece, was responsible for choosing and purchasing formula for them, "saw and relied on" the specific marketing materials identified above, and "routinely purchased" Gerber GSG products, "based on Defendant's false and misleading claims," from several different stores in the vicinity of Champaign, Illinois. Compl. ¶¶ 73-76. It is true enough that the complaint does not tell us the specific dates on which Hobbs saw the ads, or the publication(s) that included the "print advertisement" included in the complaint as Exhibit E, but Rule 9(b) does not demand that level of granularity or precision, at least in this case. *Camasta*, 761 F.3d at 737 (a plaintiff needn't "provide the precise date, time, and location that he saw the advertisement or every word that was included on it"); *see also, e.g, Biffar v. Pinnacle Foods Group, LLC*, No. 16-0873-DRH, 2016 WL 7429130, *4-5 (S.D. Ill. Dec. 22, 2016) (allegations of purchases of muffin mix over course of five years satisfied particularity requirement). The degree of particularity required by Rule 9(b) "will necessarily differ based on the facts of the case," *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011), and here Hobbs alleges that she encountered Gerber's allegedly false advertising "routinely" during the identified period by means of marketing initiatives that were clearly broadly based (involving product labeling, television

advertising, and national print advertising); this is not a claim where the date is necessary to identify a single putatively offending advertisement, as in *Camasta*. That Hobbs cannot identify the specific dates on which she saw Gerber's GSG marketing materials does not matter nearly so much when the offending materials were essentially ubiquitous and her alleged exposure to them routine during the period she defines.

The complaint, in short, identifies the particular materials Hobbs saw, alleges that Hobbs saw them frequently between 2012 and early 2014 when she was caring for her infant relatives, and purchased the products based on Gerber's claims about GSG's capacity to prevent allergies and the FDA's endorsement thereof. These allegations satisfy Rule 9(b)'s requirements. *See, e.g., Hasemann v. Gerber Prod. Co.*, No. 15-CV-2995 (MKB), 2016 WL 5477595, at *14 (E.D.N.Y. Sept. 28, 2016) (concluding on the basis of substantially similar allegations that "Plaintiffs have identified with particularity the allegedly deceptive representations, the speaker, what was stated, when it was stated and where the statements were made.").

## B. Adequacy of Allegations Regarding Falsity

Gerber also argues that Hobbs' complaint fails to adequately allege "how Gerber's statements are false." Mem. at 9. Gerber maintains that, because there is some scientific support for its claims,[6] Hobbs' allegations of falsity fail as a matter of law—in other words, Gerber

---

[6] Gerber's suggestion that "the FDA considered and relied upon no less than 148 scientific studies and reports before determining that the 'current scientific evidence *is appropriate* for considering the exercise of enforcement discretion," Mem. at 11 (emphasis in original), is problematic in at least two ways. First, the FDA did ***not*** rely upon the 148 articles and studies cited by Gerber; to the contrary, it concluded that it should rely on only four of those studies, and of those four, only two provided any support for Gerber's claims. *See* FDA 2011 Letter at 6-10 ("two studies reported a beneficial relationship"; "[t]wo other studies showed no beneficial relationship"). Second, Gerber's fondness for the FDA's statement that there is evidence "*appropriate* for considering the exercise of enforcement discretion" is unwarranted; that statement implies no endorsement of the conclusions of any studies, only that there is evidence—whether pro or con—that is appropriate to consider in assessing whether the FDA should exercise its enforcement discretion to permit Gerber to make any claims about the benefits of partially

maintains that to satisfy Rule 9(b)'s particularity requirement, Hobbs "must allege that all reasonable experts in the relevant scientific field agree that the representation is false." Mem. at 12. Gerber's argument relies on the Fourth Circuit's opinion in *In re GNC Corporation; Triflex Prods. Marketing and Sales Practices Litig. (No. II)*, 789 F.3d 505 (4th Cir. 2015) (hereafter, "*GNC*"), where the court held that "to state a claim for false advertising, plaintiffs must allege that all reasonable experts in the field agree that the representations are false. If plaintiffs cannot do so because the scientific evidence is equivocal, they have failed to plead that the representations based on this disputed scientific evidence are false." *Id*. at 516. This Court, however, is unpersuaded by *GNC*'s analysis, which of course is not binding.

As a threshold matter, the holding in *GNC* must be read in the context of the plaintiffs' allegations in that case. There, the plaintiffs cast their claim expressly in terms of the weight of scientific authority, alleging that the various health representations made on the products' packaging were false because "the vast weight of competent and reliable scientific evidence" indicated that the products (glucosamine and chondroitin) did not provide the promised health benefits. *Id*. at 510. But critically (at least in the view of the Fourth Circuit), the *GNC* plaintiff did not maintain that there was no expert support for GNC's marketing claims; rather, the plaintiff conceded that "some reasonable experts disagree and believe that glucosamine and chondroitin can provide the symptom relief promised by the Companies. In other words, . . . ***the [plaintiff] alleges that the scientific evidence . . . is equivocal***." *Id*. at 515 (emphasis added).

Not so here. Hobbs does not equivocate in her allegations that Gerber's claims regarding the benefits of GSG are false. "Scientific evidence concludes," she asserts, "that ingesting infant

---

hydrolyzed whey formula. As noted, the FDA ultimately determined that the appropriate evidence provided "little" and "very little" scientific support for various claims Gerber advanced about the benefits of partially hydrolyzed whey formula.

formula made with partially hydrolyzed whey protein does not reduce the risk of infants of [sic] developing allergies." Resp. at 2. *See also id.* at 3 (characterizing the statement that GSG prevented infants from developing allergies as "a claim rejected by scientific research"); Compl. ¶ 41 ("Defendant possessed actual knowledge that . . . its claim that partially hydrolyzed whey protein reduced the risk of infant allergies was baseless, false and incurable"). Hobbs is only slightly less emphatic in her statements about the falsity of Gerber's claims that GSG reduced the risk of developing atopic dermatitis. *See, e.g.*, Resp. at 3 ("research funded by Gerber's affiliate proved the assertion [that partially hydrolyzed whey protein reduces the risk of developing atopic dermatitis] to be false"); *id.* at 4 (describing the claim as "disproven by scientific research"); Compl. ¶ 47 (Gerber knew that "its claim that partially hydrolyzed whey protein reduced the risk of infants developing atopic dermatitis was false or supported by little or very little scientific evidence").

Unlike the plaintiff in GNC, Hobbs frames her claim not in terms of the relative weight of the scientific evidence but on a factual assertion about whether Gerber's claims about GSG are true. "[T]he falsehood alleged by Plaintiff is not that all experts agree that Defendant's product lacks a health benefit, but rather that the product in fact lacks that benefit." *Zakaria v. Gerber Prod. Co.*, No. LACV1500200JAKEX, 2015 WL 4379743, at *3 (C.D. Cal. July 14, 2015) (distinguishing *GNC* on this basis). *See* Compl. ¶ 3 ("Plaintiff brings this class action lawsuit challenging false representations . . . by Defendant in Good Start Gentle's promotion campaign"). As a result, the existence of a dispute about that fact is not fatal to Hobbs' claim; to the contrary, disputes about facts must, at the pleading stage, be resolved in Hobbs' favor.

The manner in which Hobbs frames the issue of falsity does more than just distinguish this case factually from *GNC*. It also properly respects the line that the law endeavors to maintain

between opinion and fact. Experts offer opinions as to facts, but we do not accord those experts the privilege of determining the facts; that role belongs to the jury (or the judge). That two experts disagree at trial about the truth or falsity of a statement does not, of course, preclude the fact-finder from resolving the disputed fact question; no more should the plaintiff's acknowledgment of some competing expert opinion preclude her from attempting to prove the fact at issue by conducting discovery and developing the most persuasive argument possible to support her position as to the truth or falsity of the disputed fact. Gerber cannot insulate its statements from claims of falsity by locating a single expert who will endorse them; absolute certainty is not the evidentiary benchmark in civil (or even criminal) litigation. To prove that a statement by Gerber is false, Hobbs's burden is only to establish falsity by a preponderance of the evidence.

It bears reminding, too, that plausibility remains the pleading benchmark, even when a claim is subject to Rule 9(b)'s particularity requirement. *Presser*, 836 F.3d at 778 (in alleging fraud, "the grounds for the plaintiff's suspicions must make the allegations *plausible*) (emphasis in original); *U.S. ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1106 (7th Cir. 2014) ("The requirement of pleading fraud with particularity includes pleading facts that make the allegation of fraud plausible."). In pleading her claim, the plaintiff's burden is to allege facts from which it is plausible to infer that the statement at issue is false, not to allege that every expert in the world agrees that it is false or to otherwise prove the statement's actual falsity. This is true even where Rule 9(b) applies; the rule "does not require a plaintiff to demonstrate that a representation was indeed false." *Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006) (citing *Bankers Tr. Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992)). *See also U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009) ("a pleading [need not] exclude all possibility of honesty in order to give the particulars of fraud"). As the Second Circuit has

explained, "[w]hile Rule 9(b) requires that 'the circumstances constituting fraud' be 'state[d] with particularity,' Fed. R. Civ. P. 9(b), it does not require factual pleadings that demonstrate the **probability** of wrongdoing." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 174 (2d Cir. 2015) (emphasis in original). Requiring more than a plausible inference of fraud would run contrary to the Supreme Court's admonition that "[t]he plausibility standard is not akin to a 'probability requirement'...." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

Whether GSG reduces allergies or incidences of atopic dermatitis is a question of fact. Presentation of expert opinion testimony presents a question of evidence, and the number and quality of competing opinions is a matter of evidentiary weight. That an expert believes that GSG reduces allergies may, of course, be highly relevant evidence in GSG's favor, but it is not dispositive of that fact question, particularly where competing opinions have also been introduced. Hobbs has met her burden to plausibly allege that Gerber's statements are false by also alleging facts that make the inference of falsity plausible—such as the FDA's findings in 2006 and 2011 and the Lowe study's conclusion that "[t]here was no evidence that introducing pHWF [partially hydrolyzed whey formula] at the cessation of breast-feeding reduced the risk of allergic manifestations, including eczema . . . ." Compl. Ex. A at 6. The actions of the FDA and the findings of the Lowe study suffice to make plausible and sufficiently particular Hobbs' allegations that the claims Gerber makes about GSG and allergy reductions are not true. Hobbs' allegations are not conclusory; they are supported by enough factual detail to push them across "the line between possibility and plausibility of 'entitlement to relief.'" *Twombly*, 550 U.S. at 557. That is all she is required to do to move forward on her complaint.

Finally, on this point, it must also be noted that Gerber is only half-right in arguing that Hobbs' claims turn on the allegation that Gerber's statements were false. In fact, in addition to alleging that Gerber's statements about GSG's benefits are false, Hobbs also alleges that they are misleading. "[U]nlike the plaintiffs in *In re GNC Corp.*, Plaintiff advances theories of liability that go beyond a claim that Defendant knowingly made a false statement about its product. She also relies on the theory that Defendant misstated the FDA's support of the health claims of Good Start Gentle. . . . *In re GNC Corp.* left open the possibility that a false advertising claim could be brought where a manufacturer made representations that implied greater support for its health claims than were present." *Zakaria v. Gerber Prod. Co.*, No. LACV1500200JAKEX, 2015 WL 4379743, at *3 (C.D. Cal. July 14, 2015). Even if allegations of fact sufficient to establish actual falsity were required (and, for the reasons stated, they are not) to establish a claim based on false statements, the complaint would survive because it is also based on allegations of statements that are alleged to be not literally false but simply misleading, such as the claim that GSG was the "1ST & Only" formula endorsed by the FDA to reduce the risk of developing allergies. Compl. ¶ 3(c).

### C. Adequacy of Allegations of Damages

Gerber also asserts that Hobbs has failed to plead damages with the requisite particularity because under Illinois law, "the actual damage element of a private ICFA action requires that the plaintiff suffer 'actual pecuniary loss.'" *Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010) (quoting *Mulligan v. QVC, Inc.*, 382 Ill. App. 3d 620, 628, 888 N.E.2d 1190, 1197 (1st Dist. 2008)). This argument falters at the gate. *Carter* and *Mulligan* were deceptive price comparison cases, in which the courts held that there was no "actual pecuniary loss" in the absence of any allegations that the products purchased were not actually worth the price that the consumer plaintiffs paid. In those cases, the damage claim was premised on arguments that the defendant had misrepresented the amount the buyers would ***save*** buying at putative sale prices rather than any claim that the

products purchased were not worth the prices that the consumers had paid. *Camasta*, on which Gerber also relies for its "no actual damages" argument, is distinguishable on this point for the same reason.

By contrast, Hobbs adequately alleges "actual pecuniary loss." Specifically, she maintains that the cost of GSG was "inflated" on the basis of its allegedly false and misleading claims, that she purchased GSG "rather than competitor infant formulas" because of its health claims, and that she would not have purchased Gerber's GSG at all, or would not have purchased it at the price at which it was sold, absent Gerber's allegedly false and misleading statements. *See, e.g.*, Compl. ¶¶ 3, 63-64, 75, 78, 103. These allegations, to be sure, are not factually robust, but the Court reads the complaint to claim that Hobbs did not receive the benefit of the bargain—that she did not receive what she thought she was paying for—and that suffices as a claim of actual pecuniary loss. "When a plaintiff alleges that it purchased something because of a fraudulent misrepresentation, there is actual injury when the plaintiff suffers a pecuniary loss by receiving goods that are worth less than was promised." *Aliano_v. Louisville Distilling Co.*, LLC, 115 F. Supp. 3d 921, 931 (N.D. Ill. 2015); *Muir v. Playtex Prods., LLC*, 983 F. Supp. 2d 980, 990 (N.D. Ill. 2013) (plaintiff may plead actual damages by alleging that he was deprived of the benefit of the bargain because the product was worth less than it would have been worth absent deception or misrepresentation). Gerber contends that Hobbs fails to allege that GSG was not worth what she paid for it, because she has not alleged what other infant formulas were selling for, but that confuses price and value. Hobbs is uniquely situated to know whether she would have purchased GSG at the same price absent the allegedly false and misleading statements; she says she would not have and the Court is bound to accept that statement for purposes of evaluating the motion to dismiss. And an allegation that the purchase would not have been made, at all, or at the same price, absent the fraud

renders at least some portion of the purchase a loss. *Jamison v. Summer Infant (USA), Inc.*, 778 F. Supp. 2d 900, 911–12 (N.D. Ill. 2011) (allegations that plaintiffs "would not have purchased the Video Monitors, or paid the purchase price for the Video Monitors, had this information been provided on the Video Monitors' packaging or in its advertising" constitutes a claim for "actual damages" in the amount paid); *see also, e.g., McDonnell v. Nature's Way Prod., LLC*, No. 16 C 5011, 2017 WL 1149336, at *3 (N.D. Ill. Mar. 28, 2017) (allegations that plaintiff "paid more for the products than they were actually worth" and "would not have purchased the vitamins at the price she paid if she had known that they contained foreign-sourced vitamins" sufficed to plead actual pecuniary loss); *Biffar,* 2016 WL 7429130, at *4 (allegation that price of muffin mix was "more than the value of the muffin mix as sold and that she would not have purchased it or would have paid less for it had she known it contained synthetic ingredients" sufficient to plead a plausible theory of actual damages).

Gerber goes further off-track in asserting that Rule 9(b)'s particularity requirement applies to damages allegations. Reply at 8. Gerber offers no support for that contention and by its terms, "Rule 9(b) 's particularity requirement applies only to allegations of fraud." *Lachmund v. ADM Inv'r Servs., Inc.*, 191 F.3d 777, 783 (7th Cir. 1999); *see also Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 446 (7th Cir. 2011) ("[T]he dictates of Rule 9(b) apply to allegations of fraud, not claims of fraud."). Accordingly, the prevailing view among courts in this Circuit that have considered the issue is that "Rule 9(b) applies to the specifics of alleged misrepresentations, but the notice pleading requirements of Rule 8 apply to other aspects of the plaintiff's complaint, such as damages . . . ." *Marquette Bank v. Brown*, No. 4:14-CV-00034-SEB, 2015 WL 1505685, at *6 (S.D. Ind. Mar. 31, 2015). *See also, e.g., Smith v. I-Flow Corp.*, 753 F. Supp. 2d 744, 749 (N.D. Ill. 2010) ("The particularized pleading standard of Federal Rule

of Civil Procedure 9(b) does not apply to allegations supporting a claim of punitive damages."); *Native Am. Arts, Inc. v. Duck House, Inc.*, No. 05 C 2176, 2007 WL 8045973, at *3 (N.D. Ill. Mar. 1, 2007) ("Rule 9(b) only requires that the circumstances of fraud be alleged with particularity; Rule 9(b) does not require that resulting injury or damages be pleaded with particularity."); *Hometown Sav. & Loan Ass'n, F.A. v. Moseley Sec. Corp.*, 703 F. Supp. 723, 726 (N.D. Ill. 1988), *abrogated on other grounds by First Comics, Inc. v. World Color Press, Inc.*, 884 F.2d 1033, 1039-40 (7th Cir. 1989) ("Rule 9(b) does not apply to a damages claim in a fraud action, the general pleading rules apply."). *See also Camata*, 761 F.3d at 739-40 (analyzing the adequacy of damages pleading separately from its discussion of adequacy of fraud allegations under Rule 9(b) and expressly considering the adequacy of damages allegations based on Rule 8(a), not Rule 9(b)). Hobbs' task in pleading damages is simply to plead facts that support a plausible inference that she experienced an actual pecuniary loss as a result of Gerber's allegedly false statements.[7] Her complaint meets that standard.

In its reply brief, Gerber points to *Sabo v. Wellpoint*, 2017 WL 1427057 (N.D. Ill. April 21, 2017), as support for its position, but this Court finds that case to be distinguishable on the basis of what was actually pled. In *Sabo*, the question was whether the plaintiff adequately pled that he had suffered a loss as a result of purchasing pet food bearing a misleading label that it had been "Made in the USA." Unlike here, the *Sabo* plaintiff did "not allege that he would not have bought defendant's . . . products" or the he did in fact pay more than he would have for the product because of the false label. *Id*. at *3. Hobbs, by contrast, expressly pleads those facts. The other

---

[7] To the extent that Gerber argues that Hobbs was required to allege with particularity the **amount** of pecuniary loss she experienced, there simply is no such requirement. *See Aliano*, 115 F. Supp. 3d at 931 ("Such a standard would require Aliano and Fratelli to calculate their damages, a much higher bar than alleging an injury.").

cases on which Gerber relies are distinguishable for essentially the same reason. *See, e.g.,*
*Demedicis v. CVS Health Corp.*, 2017 WL 569157 (N.D. Ill. Feb. 13, 2017) ("Plaintiff merely
alleges that he prefers products made in the United States and that he is willing to pay a premium
for them"—not that he actually did so). Unlike those cases, the allegations of Hobbs' complaint
permit an inference, which this Court finds plausible, that Hobbs either would not have purchased
the product, or would have purchased a lower-priced product, but for the allegedly false and
misleading statements of the defendant.

### D.     ICFA's Authorized Practices Exemption

Gerber also says that it is not liable for violating the ICFA because the statute exempts
from liability conduct that is "specifically authorized' by federal law. This argument rests on
Gerber's contention that its marketing materials complied with the limited QHCs the FDA granted
to Gerber in 2011. But the "specifically authorized" exemption is a safe harbor affirmative defense,
and Plaintiffs are not required to anticipate and attempt to plead around affirmative defenses. *Keith
v. Ferring Pharm., Inc.*, No. 15 C 10381, 2016 WL 5391224, at *11 (N.D. Ill. Sept. 27, 2016) (St.
Eve, J.); *cf. Hecker v. Deere & Co.*, 556 F.3d 575, 588 (7th Cir. 2009). As such, it is Gerber's
burden to demonstrate, based on the facts pleaded in the complaint (which is all the Court may
consider at this juncture) that its marketing statements adequately complied with the limited QHCs
granted by the FDA. The complaint, however, plainly and plausibly alleges that they did not
comply with the limited QHCs and, given the specificity of the limited QHCs that the FDA
approved, it is difficult to fathom an argument to the contrary. In any event, neither of Gerber's
briefs even attempts to explain how the statements identified as false or misleading by Hobbs
complied with the QHCs or were otherwise "specifically authorized" by the FDA, so its invocation
of the "specifically authorized" exemption does not merit dismissal of the complaint.

\*   \*   \*

Having concluded that Hobbs' complaint states a claim based on a theory that Gerber's marketing statements regarding GSG violate the ICFA, it is unnecessary to consider the merits of Gerber's challenges to the alternative theories of breach of warranty and fraudulent misrepresentation presented in the complaint.[8] The complaint survives; full testing of the legal theories under which Hobbs alleges Gerber's liability awaits summary judgment or trial. Gerber's motion to dismiss the complaint is denied.


Dated: August 14, 2018

_____
John J. Tharp, Jr.
United States District Judge

---

[8] That said, to the extent that Gerber's challenges to those claims are based on the same arguments it advanced regarding the ICFA count (*see* Mem. 16, 19), they fail as to those theories as well.